# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER KOUKOS, *et al.*,

                  *Plaintiffs,*

v.

CHESTER COUNTY, *et al.*,

                  *Defendants.*

CIVIL ACTION
NO. 16-4602

**PAPPERT, J.**                                                                 **February 7, 2017**

## MEMORANDUM

Plaintiffs Christopher Koukos, a former inmate of Chester County Prison, and his wife Carly sued Chester County, PrimeCare Medical Inc., Prison Warden D. Edward McFadden, Prison Deputy Warden of Treatment Ronald M. Phillips, Medical Assistant Jenice Abney, Nurses Amanda Hines and Samantha Budynkiewcz, Medical John Does 1–10[1] and Correctional John Does 1–7.[2]  Koukos alleges, *inter alia*, that Defendants provided inadequate medical care in violation of his rights under 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution.  Currently before the Court is a motion to dismiss for failure to state a claim filed by Chester County, McFadden, Phillips and Correctional Does.  As explained below, the Court grants in part and denies in part the Defendants' motion.

## I.

On August 20, 2014, Christopher Koukos was sentenced by the Chester County Court of Common Pleas to nine to twenty-three months of incarceration.  (Pls.' Am. Compl. ¶ 27, ECF

---

[1]       Medical John Does 1-7 were medical professionals employed by PrimeCare assigned to provide medical services at Chester County Prison.  Plaintiffs do not presently know the names of Defendants but will seek leave to amend the complaint after initial discovery.  (Pls.' Am. Compl. ¶ 10.)

[2]       Likewise, Correctional John Does 1-10 are yet unidentified correctional officers or supervisors employed by Chester County to work at CCP.  (*Id.* ¶ 13.)

No. 10, Ex. 1.)  Prior to his sentencing, Koukos was being treated for various medical conditions for which he was prescribed several medications.  Specifically, he was taking diazepam, metoprolol, oxycodone, oxycontin, paroxetine, prilosec, paxil and klonopin for ailments which included tachycardia, neck and shoulder pain, migraines, numbness in his extremities and post-traumatic stress disorder.  (*Id.* ¶¶ 18–19.)  In anticipation of his incarceration, Koukos consulted with his physicians and obtained from them a summary of his medical history, treatment and prescribed medications, together with the actual medications in their prescription bottles ("medical needs package") to bring with him for presentation to the appropriate prison medical personnel.  (*Id.* ¶ 20.)  He took his last dose of medication at 11:00 a.m. on the day of his sentencing.  (*Id.*)  He was sentenced at 1:00 p.m. and arrived at Chester County Prison ("CCP") at approximately 3:00 p.m.  (*Id.* ¶¶ 17, 21.)

Upon his arrival, he presented his medical needs package to Correction Doe 1, a young African American male correctional officer.  (*Id.* ¶ 21.)  Koukos alleges that Correction Doe 1 wrongfully informed him that his package would be transferred to PrimeCare, the private company that provides health services to CCP inmates, for consideration and distribution. Koukos contends that Correction Doe 1 knew or should have known that his package would be destroyed.  (*Id.* ¶ 21.)  At approximately 8:00 p.m. he was seen by a PrimeCare Medical Assistant Jenice Abney, for what he later learned was an initial intake medical examination.  (*Id.* ¶ 22.)  During the examination, Koukos requested that he be permitted to take a dose of his next scheduled medication, an opiate, because he had already missed one dose.  (*Id.* ¶ 23.)  According to Koukos, Abney informed him that all of the medication he had brought into the prison would be destroyed and that she was unable to provide him any of his prescribed medications, since any

medications would need to be prescribed by a PrimeCare doctor. There was, however, no doctor regularly at the prison. (*Id.*)

At the conclusion of the examination, Abney noted in prison records that Koukos was at risk for opiate and benzodiazepine withdrawal and that he had a heart condition. (*Id.* ¶ 24.) She also noted that for medical reasons, Koukos should be assigned to a bottom bunk. (*Id.*) Amanda Hines, a licensed practical nurse employed by PrimeCare, reviewed Abney's notes prior to the conclusion of the examination and was therefore also aware of Koukos's medical needs. (*Id.* ¶ 25.) Koukos alleges that neither Abney nor Hines informed him of his "right" to a bottom bunk assignment or took any actions to ensure that Koukos would thereafter be monitored or evaluated while undergoing opiate and benzodiazepine detoxification. (*Id.* ¶¶ 24, 25, 27.)

His intake examination concluded around 10:00 p.m. At that time, Koukos alleges that Correctional Does 2 and 3 were "either not personally advised of and/or in any event ignored the [ ] medical designation and instead assigned [Koukos] to occupy the top bunk in a cell, placing him at serious, foreseeable, and known risk of falling and sustaining serious bodily injury or death." (*Id.*) By 10:15 p.m., as a result of having been without his prescription medication for approximately eleven hours, Koukos began to experience debilitating physical and psychological withdrawal symptoms, including prolonged spasms, shaking and profuse sweating. (*Id.* ¶ 28.) He informed Correctional Doe 4 that he had not received his necessary medication and was feeling ill, to which Doe 4 allegedly responded, "Get away from me, you're making me nervous. Medical is closed." (*Id.* ¶ 29.) Koukos immediately requested and filled out a medical request slip indicating that he was suffering from opiate and benzodiazepine withdrawal and that the prison had failed to provide him with the appropriate detox medication as well as his prescribed medication for tachycardia. (*Id.* ¶ 30.) He then tried to sleep but was unable to due to

increasingly severe withdrawal symptoms, which in turn began to exacerbate his tachycardia. (*Id.* ¶ 31.)

On August 21 Koukos went to breakfast but was unable to eat due to nausea, stomach cramping and his other ongoing symptoms of withdrawal.  (*Id.* ¶ 32.)  At that time, he spoke to Correctional Doe 5 and requested to be sent to the medical department to be evaluated and receive treatment for his symptoms of profuse sweating, shaking and disorientation, which he alleges were or should have been apparent to Doe 5.  (*Id.*)  According to Koukos, Correction Doe 5 denied his request and sent him back to his cell.  (*Id.* ¶ 33.)  Koukos then completed another medical request slip seeking attention for his worsening symptoms of opiate withdrawal and tachycardia.  (*Id.*)

Koukos was similarly unable to eat lunch so he submitted another medical request slip seeking treatment, this time to Correction Doe 6.  (*Id.* ¶ 34.)  That request was also denied and he was taken to his cell.  (*Id.*)  As a result, Koukos's symptoms further intensified, exacerbating his heart condition and causing him to shake and sweat uncontrollably.  (*Id.* ¶ 37.)  He claims Correctional Does continued to ignore these observed symptoms and he was left in his top bunk and denied medical attention.  (*Id.*)

In the early morning hours of August 22, allegedly as the result of his withdrawal symptoms, sleeplessness and uncontrollable spasms, Koukos fell from the upper bunk.  (*Id.* ¶ 38.)  His face struck the cell's steel desk and his body slammed into a metal chair.  (*Id.* ¶ 38.)  He landed face first on the floor of the cell and sustained various injuries, including a concussion with loss of consciousness, nasal swelling, rib fractures, right hip bruising, abrasions to his ribs and knees, a right orbital rim fracture, soft tissue hemorrhage, left pleural effusion, bibasal lung

atelectasis and damage to his right optical nerve.  (*Id.*)  He was taken to the Chester County

Hospital emergency room.  (*Id.* ¶¶ 38–39.)

Koukos was discharged a few hours later with instructions to take antibiotics, apply ice to

his face every twenty minutes to reduce swelling and to receive an evaluation at Ear, Nose and

Throat Associates of Chester County ("ENTACC") within two to three days.  (*Id.* ¶ 41.)  Despite

these instructions, Koukos alleges that Defendants failed to provide him with antibiotics, ice and

pain medication, leaving him in excruciating pain for many days.  (*Id.* ¶ 42.)  Upon his return

from the hospital, he was placed in solitary confinement on the medical block where he could,

ostensibly, be observed for ongoing complications.  (*Id.* ¶ 43.)  However, he alleges he was not

actually monitored for any further post-concussion or withdrawal symptoms and Defendants

continued to withhold the antibiotics, pain medication and ice for his injuries.  (*Id.*)

On August 23 Koukos was seen by Medical Doe 1, who represented that he/she was a

physician assistant.  Doe 1 told Koukos he would be transferred to a regular cell without further

treatment or monitoring.  (*Id.* ¶ 44.)  After the transfer, Koukos requested from Correctional Doe

7 that he be provided with ice packs; however, despite observing Koukos's injuries, Doe 7 denied

his request "in direct violation of the treatment regime prescribed by the physician and medical

staff at Chester County Hospital."  (*Id.* ¶¶ 45–46.)

Despite the discharge instruction that Koukos be seen within two to three days of his

release from the ER, he was not taken to ENTACC to be examined for the ongoing pain in his

right eye until September 8, 2014.  (*Id.* ¶ 47.)  At that time, he was examined by a doctor and

underwent a diagnostic nasal endoscopy.  (*Id.*)  Koukos alleges that the delayed diagnostic

testing and the passage of time prevented further treatment from being an option.  (*Id.*)  He was

instructed to return for a follow-up exam in one month.  (*Id.* ¶ 48.)  Defendants ignored this order and did not bring him back to ENTACC.  (*Id.*)

Koukos alleges that despite medical directives, Defendants withheld reasonable, necessary and prescribed care, failed to ensure that he received the appropriate follow-up treatment for his injuries and allowed him to remain in significant pain for approximately nine months until he was able to seek treatment after his release.  (*Id.* ¶ 49.)  Koukos further alleges that as the result of his fall, and subsequent denial of medical care, he has suffered permanent injury: he can no longer read for more than ten minutes; experiences ongoing tenderness in his right cheekbone which disrupts sleep; suffers from chronic pain in his right hip which affects his mobility and experiences migraines and scarring under his right eye.  (*Id.* ¶ 40.)

## II.

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The "mere possibility of misconduct" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The court must construe the complaint in the light most favorable to the plaintiff.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016) (citations omitted).  However, a court need not accept as true inferences drawn by the plaintiff that are unsupported by facts.  *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell*, 550 U.S. at 555 (2007) (citations and alterations

omitted); *see Iqbal*, 556 U.S. at 678 (2009) ("Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."). A court should "consider

only the allegations in the complaint, exhibits attached to the complaint, matters of public record,

and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d

Cir. 2004). Whether a complaint states a plausible claim for relief is a context-specific task that

"requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556

U.S. at 679 (citations omitted).

### III.

In Count I, Koukos asserts claims pursuant to § 1983 for inadequate medical treatment

under the Eighth Amendment. To establish a *prima facie* case under § 1983, Koukos must first

demonstrate that a person acting under color of law deprived him of a federal right. *See Groman

v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). Koukos must also show that the person

acting under color of law "intentionally" violated his constitutional rights or acted "deliberately

indifferent" in violation of those rights. *See, e.g.*, *Cty. of Sacramento v. Lewis*, 523 U.S. 833,

843–44 (1998); *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (citing *Hill v. California*, 401

U.S. 797, 802–05 (1971)); *see also Berg v. Cty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000).

"The Eighth Amendment's prohibition against cruel and unusual punishment protects

prisoners against the 'unnecessary and wanton infliction of pain.'" *Hamilton v. Leavy*, 117 F.3d

742, 746 (3d Cir. 1997) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Accordingly, "the

treatment a prisoner receives in prison and the conditions under which he is confined are subject

to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)

(quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). The prohibition against cruel and

unusual punishment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

### A.

Koukos purports to bring Eighth Amendment claims against all Defendants, including Chester County, Prison Warden McFadden and Prison Deputy Warden of Treatment Phillips, in both their individual and official capacities. However, a suit against the county is analyzed under the *Monell* framework, and suits against state officers in their official capacity are "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978)); *see also Brown v. Montgomery Cty.*, No. 08-4259, 2010 WL 742818, at *2 (E.D. Pa. Feb. 24, 2010) (holding that claims asserted against government officers in their official capacity "effectively merge with claims against, the real party in interest, [the] County"). Because Koukos also sued the County, his claims against McFadden and Phillips in their official capacities are redundant, and the Court will only analyze the purported claims against them in their individual capacities.

To establish an Eighth Amendment claim for inadequate medical treatment against McFadden, Phillips and Correctional Does 1–7, Koukos must show that (1) Defendants were deliberately indifferent to his medical needs and (2) those needs were serious. *Rouse*, 182 F.3d at 197. Defendants do not dispute that Koukos's medical needs were serious. *See generally* (Defs.' Mot. to Dismiss, ECF No. 11). The only issue is whether Defendants were "deliberately indifferent" to those needs.

"It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse*, 182 F.3d at 197.

Rather, deliberate indifference "requires obduracy and wantonness . . . which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Id.* (citation and quotation omitted).  Additionally, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Ascenzi v. Diaz*, 247 F. App'x 390, 391 (3d Cir. 2007) (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  The Third Circuit has "found 'deliberate indifference' in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citations omitted).

"A prison official acts with deliberate indifference to a prisoner's medical needs only if he or she 'knows of and disregards an excessive risk to inmate health or safety.'" *Wall v. Bushman*, 639 F. App'x 92, 94 (3d Cir. 2015) (quoting *Farmer*, 511 U.S. at 837).  "However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001).  Deliberate indifference is also satisfied when prison authorities "deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).  "[W]here knowledge of the need for medical care is accompanied by the intentional refusal to provide that care," deliberate indifference is present. *Id.*  Deliberate indifference may be manifested by "intentionally denying or delaying access to

medical care or intentionally interfering with treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976).

The deliberate indifference analysis, however, is slightly different when the defendant is a non-medical prison official. *See Donnell v. Corr. Health Servs., Inc.*, 405 F. App'x 617, 622 (3d Cir. 2010). The Third Circuit has stated that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236. "Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff." *Spencer v. Courtier*, 552 F. App'x 121, 124 (3d Cir. 2014) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993)). In *Spruill*, the Third Circuit affirmed dismissal of a non-medical defendant, stating that a non-medical prison official is not chargeable with the Eighth Amendment scienter requirement of deliberate indifference "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d at 236.

**i.**

With respect to Koukos's claims against McFadden and Phillips in their individual capacities, Koukos fails to state a claim. "To establish personal liability in a § 1983 action, [plaintiff must] show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 167. "More particularly, the plaintiff must allege that the defendant was personally involved in the deprivation." *Johnson v. Derose*, 349 F. App'x 679, 681 (3d Cir. 2009). Although Koukos alleges that McFadden and Phillips were responsible for insuring that inmates received adequate medical care and drafting and implementing CCP's policies related to such care, (Pls.' Am. Compl. ¶ 12), he does not allege that either of them had

10

personal awareness of, or direct involvement with, either the allegedly inadequate medical care he received or any of the alleged decisions that rendered the care inadequate.  Koukos's allegations are thus insufficient to state a claim against McFadden and Phillips in their individual capacities.  *See, e.g.*, *Brown v. Deparlos*, 492 F. App'x 211, 214–15 (3d Cir. 2012); *Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003) (holding that defendants in § 1983 civil rights actions "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence").

## ii.

Koukos also purports to bring claims against several unidentified, non-medical correctional officers.  Correction Doe 1 informed Koukos that his medical needs package would be transferred to medical for consideration and distribution.  Koukos claims that Correctional Doe 1 in fact knew or should have known that his package would be destroyed.  Even disregarding the conclusory nature of this allegation and taking it as true, it is insufficient to plead that Correctional Doe 1 acted with reckless disregard to Koukos's serious medical needs.

Next, Koukos alleges that Correction Does 2 and 3 assigned him a top bunk despite the medical designation that he should be assigned a bottom bunk.  Koukos concedes that he does not know whether the correctional officers were made aware of the medical designation.  He alleges that either the doctors failed to make the officers aware of the designation and the officers assigned him a top bunk without any knowledge of the restriction *or* the officers were made aware of the restriction and knowingly ignored it.  If the former is true, Correctional Does 2 and 3 were not deliberately indifferent.  If the latter is true, however, Correctional Does 2 and 3 may have been deliberately indifferent.  For this reason, Koukos's claim against them should not be dismissed at this stage.  *See Interwave Tech., Inc. v. Rockwell Automation, Inc.*, No. 05-398, 2005

WL 3605272, at *13 (E.D. Pa. Dec. 30, 2005) ("When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements.   A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.").

Koukos's allegations with respect to Correctional Does 4–6 are essentially that he approached them while experiencing evident physical symptoms (profuse sweating and uncontrollable shaking), requested that he be permitted to go to the infirmary to receive medical treatment and informed them, whether orally or by way of written statements contained in medical request slips that he submitted to them, that he was experiencing opiate withdrawal and had not been given the proper medication or necessary treatment by medical personnel. Although "[p]rison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff," *Spencer*, 552 F. App'x at 124 (citing *Durmer*, 991 F.2d at 69), Koukos has plead sufficient facts to plausibly allege that the officers had "a reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating) a prisoner."  *Spruill*, 372 F.3d at 236; *see also Gravley v. Tretinik*, 414 F. App'x 391, 394 (3d Cir. 2011) (Plaintiff's allegation that he submitted a written complaint stating that he was not being treated for his injuries to a non-medical prison official stated a cognizable claim).  Whether the officers had sufficient knowledge to render them deliberately indifferent is a determination that should be made when the record is more complete with respect to what Koukos said to each officer, what was written on the medical request slips, what process correctional officers are supposed to

follow with respect to those medical request slips and, most significantly, when and whether Koukos was seen and treated by medical staff during the relevant timeframe.[3]

Finally, Koukos contends that after he was discharged from the hospital, seen by a PrimeCare physician assistant and transferred to a new cell, he requested from Correctional Doe 7 that he be provided with ice packs to treat the pain from his fall.  (*Id.* ¶ 45.)  Koukos alleges that despite observing his injuries, Doe 7 denied his request "in direct violation of the treatment regime prescribed by the physician and medical staff at Chester County Hospital."  (*Id.* ¶ 46.) Koukos, however, does not allege that Correctional Doe 7 was aware of the prescribed treatment regime or any facts from which the Court could reasonably draw such a conclusion.  Even if he had known, such a failure to provide ice would not rise to the level of a constitutional violation. Moreover, since this occurred shortly after Koukos was seen by a medical professional, Correctional Doe 7 was "justified in believing that the prisoner [was] in capable hands."  *Spruill*, 372 F.3d at 236.  Correctional Doe 7's refusal, absent any knowledge that Koukos had been directed to apply ice to his injuries or that he had subsequently been precluded from doing so by the medical staff, cannot be said to constitute an *intentional* interference with prescribed treatment and thus did not constitute deliberate indifference.  *Cf. Estelle*, 429 U.S. at 104–105 (holding that deliberate indifference may be manifested by "intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed").

## B.

The Court analyzes Koukos's claims against the County, asserted in Count II of the amended complaint, under the standard for municipal liability set forth in *Monell v. Dep't of Soc.*

---

[3]     While Koukos alleges he was not seen or treated by prison medical staff between his August 20 intake examination and his August 22 early-morning fall from his bunk, Defendants contend that he was treated at least four times on August 21.  *See* (Defs.' Mot., at 10).  If Defendants' contentions are true, the correctional officers were likely "justified in believing that the prisoner [was] in capable hands."  *Spruill*, 372 F.3d at 236.  However, taking Koukos's allegations as true, as the Court must at this stage in the proceedings, dismissal is inappropriate.

*Servs. of City of New York*, 436 U.S. 658 (1978).  Generally, a municipality will not be held liable under the doctrine of *respondeat superior* for the misconduct of its employees.  *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).  Rather, a municipality can only be liable under § 1983 when a constitutional injury results from the implementation or execution of an officially adopted policy or informally adopted custom.  *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell*, 436 U.S. 658).

A policy "is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews*, 895 F.2d at 1480 (citation and quotation omitted).  "A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials are so permanent and well settled as to virtually constitute law."  *Id.* (citations and quotation omitted). "In either instance, a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Andrews*, 895 F.2d at 1480).  Finally, a supervisor or policymaker may be liable for failing to act affirmatively if an existing practice creates an unreasonable risk of Eighth Amendment injury and the supervisor was aware of and indifferent to that risk.  *See Beers–Capitol*, 256 F.3d at 134.

A successful *Monell* claim must therefore establish: (1) an underlying constitutional violation; (2) a policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom.  *See Monell*, 436 U.S. at 658.  To show causation where the alleged policy or custom does not facially violate constitutional rights, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S.

14

397, 407 (1997).  "A showing of simple or even heightened negligence will not suffice."  *Id.*  In other words, custom "requires proof of knowledge and acquiescence by the decisionmaker." *McTernan*, 564 F.3d at 658.

Koukos alleges four different "customs" which purportedly caused the violation of his rights.  First, he claims the County had a policy of placing "unreasonable and inhumane limitations on admissions to the infirmary as well as limitations on inmate hospitalizations in an effort to reduce medical costs."  (Pls.' Am. Compl. ¶ 97.)  Second, the County failed to establish policies and procedures to ensure that inmates undergoing detoxification from opiate dependency receive appropriate monitoring and/or treatment.  (*Id.* ¶¶ 56–67, 75.)  Third, Koukos alleges that CCP maintained a policy of "deliberately ignoring inmates' requests for medical care when they believed inmates to be addicted to opioids" and for this reason failed to submit his medical request slips.  Fourth, Koukos alleges a custom of "deliberately ignoring the orders of outside doctors regarding the need for medical treatment."  (*Id.* ¶ 51.)  He claims that consistent with this practice, Defendants ignored the orders of Chester County Hospital and ENTACC regarding follow-up care Koukos should receive, causing him pain and permanent injury.  (*Id.* ¶ 52.)  In addition, Koukos contends that the County is liable under a failure to train theory because it failed to train correctional officers to identify the symptoms of opioid withdrawal.  (*Id.* ¶¶ 108– 109); *see also* (Pls.' Resp. in Opp'n, at 11, ECF No. 13).

**i.**

Koukos's first allegation fails to state a claim under *Monell*.  Koukos claims that the County had a policy or practice of placing "unreasonable and inhumane limitations on admissions to the infirmary as well as limitations on inmate hospitalizations in an effort to reduce medical costs."  (*Id.* ¶ 97.)  His claims, however, are conclusory and he fails to explain

"what basis he has for thinking that 'policies to save money' affected his medical treatment" or "what specific treatment he was denied as a result of these policies." *See Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011) (upholding the district court's dismissal under Rule 12(b)(6) when prisoner claimed he was harmed because the defendant treated his hernia with a belt instead of surgery due to a "policy to save money"); *see also Sims v. Wexford Health Sources*, 635 F. App'x 16, 19 (3d Cir. 2015) (upholding district court's dismissal under Rule 12(b)(6) when prisoner alleged a policy of deliberate indifference in order to save money).

Moreover, it is perfectly acceptable for the County to consider costs. "[T]he naked assertion that [d]efendants considered cost in treating [Plaintiff's injuries] does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of cost constraints under which law-abiding citizens receive treatment." *Id.*; *see also Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard of *Estelle* does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society. Because it is not a violation of federal law to consider costs, Koukos must plead facts that meet the deliberate indifference standard. *Bd. of Cty. Comm'rs*, 520 U.S. at 407. He has failed to do so. Without more, Koukos's assertion that the County had a policy or custom of limiting or altering medical treatment to inmates based on cost-savings cannot survive Defendants' motion to dismiss. *See e.g., Sims*, 635 F. App'x at 19; *Simonds v. Delaware Cty.*, No. 13-7565, 2014 WL 3030435, at *5 (E.D. Pa. July 1, 2014).

**ii.**

Next, Koukos alleges that the County failed to establish policies and procedures to ensure that inmates undergoing detoxification from opiate dependency receive appropriate monitoring

16

and/or treatment.  (*Id.* ¶¶ 56–67, 75.)  He identifies McFadden and Phillips as the municipal decisionmakers responsible for ensuring inmates received adequate medical care and drafting and implementing CCP's policies related to such care.  (*Id.* ¶ 12.)  Koukos contends that due to the lack of procedures regarding the treatment of opiate-dependent inmates, his prescription medications were confiscated and not replaced, he was prevented from seeing a doctor to obtain suitable replacements, he was not monitored or assessed properly while undergoing opiate and benzodiazepine detoxification, he was not given appropriate medication to guard against the known risks of detoxification or alleviate his withdrawal symptoms and the appropriate steps to ensure that he was assigned to a bottom bunk were not taken.

Opiate-dependent individuals detoxifying from opiate use due to sudden termination of usage present significant medical issues and risks.  (Pls.' Am. Compl. ¶ 59.)  Moreover, although detoxification for individuals who are otherwise healthy is not dangerous when it takes place with proper monitoring and treatment, Koukos claims that detoxification is known to have several dangerous and potentially fatal medical consequences for those with chronic health conditions.  (*Id.* ¶¶ 60, 61.)  These consequences include dehydration, electrolyte imbalance, neurological arrhythmia or cardia arrhythmias leading to sudden cardiac arrest.  (*Id.* ¶ 62.)

For these reasons, Koukos alleges that basic standards of correctional healthcare require that people admitted to correctional facilities who openly admit opiate use and dependence, *inter alia*, "be consistently monitored, have their vital signs assessed at regular intervals, and be administered medications designed to reduce the risk of health dangers, physical responses to withdrawal and the pain associated therewith and caused thereby."  (*Id.* ¶ 63.)  These measures are allegedly necessary to ensure that an inmate undergoing opiate detoxification is not at risk for the more serious medical consequences outlined above.  Koukos alleges that reasonably trained

correctional policymakers are aware of the significant medical issues posed by opiate detoxification and withdrawal due to sudden termination and thus privy to the need to monitor the process.  (*Id.* ¶¶ 59, 66.)

A medical assistant who withholds prescription medication, knows that a patient will undergo opiate detoxification as a result, knows that such a process can pose serious risks, and possesses information about the patient's health history that suggests an increased likelihood of serious risks, but does not take sufficient precautionary measures to monitor the patient or guard against known risks is arguably acting with a mental state of recklessness.  *See Farmer*, 511 U.S. at 836 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").  Both Abney and Hines possessed this information, yet Koukos alleges that neither medical professional arranged for Koukos to return to the infirmary for assessment or informed medical or correctional staff that Koukos required such monitoring.  At the very least, Koukos's allegations are sufficient to suggest that Abney and Hines had "knowledge of the need for medical care," (Koukos's need to be monitored, have his vital signs assessed and/or be administered appropriate medication), and intentionally refused to provide it.  *See Spruill*, 372 F.3d at 235.  Koukos has thus successfully alleged a constitutional violation.

Koukos has also successfully alleged a custom attributable to the County.  *See Beers-Capitol*, 256 F.3d at 134 ("[T]o hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury

18

resulted from the policy or practice." (citing *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989))). According to Koukos, reasonably trained correctional and healthcare policymakers are "aware of the patterns of increased use of opiate-based controlled substances, particularly for chronic health conditions," and are "particularly attuned to patterns of opiate use and abuse due to the disproportionately high number of opiate-dependent individuals typically present in the correctional population."  (Pls.' Am. Compl. ¶¶ 57–58.)

Koukos alleges that the County was aware of this particular medical issue (common to the inmate population), of the serious risks associated with detoxification, the need to monitor inmates admitted to correctional facilities with histories of opiate abuse and the need to establish specific policies and guidelines for their employees regarding the care of such inmates.  (*Id.* ¶¶ 65–67.)  Specifically, he claims that "reasonable steps" should be taken to monitor, "evaluate, diagnose, and treat individuals who had a history of [opiate use or dependency], including the symptoms of withdrawal therefrom which [are] known to place the withdrawing subject at considerable discomfort, at serious risk of medical conditions that could foreseeably result in serious injury or even death."  (*Id.* ¶ 56.)  Koukos has adequately alleged that the County was deliberately indifferent in failing to establish any such policies or procedures.

Finally, Koukos alleges that the County's failure to establish appropriate policies and procedures for the monitoring and treatment of inmates undergoing detoxification after admission in turn led to the failure of the individual Defendants to adequately monitor, assess and treat him.  These allegations are sufficient to state a claim.  *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (holding that a reasonable jury could conclude that failing to establish a policy to address the immediate medication needs of inmates with serious medical conditions constituted deliberate indifference on the part of a prison health system);

*Ramos-Vazquez v. PrimeCare Med., Inc.*, No. 09-00364, 2010 WL 3855546, at *8–9 (E.D. Pa. Sept. 30, 2010) (holding that plaintiff's allegations were sufficient where he alleged that pursuant to defendants' customs, he was denied his medication and not treated despite defendants' knowledge that failure to treat his disorder could have serious consequences).

### iii.

Koukos also alleges that the County "maintained an unconstitutional policy or practice of deliberately ignoring inmates' requests for medical care when they believed inmates to be addicted to opioids" and, pursuant to this practice, the Correctional Doe Defendants "intentionally failed to submit [his] medical request slips with deliberate indifference to [his] obvious and increasing need for medical attention." (Pls.' Am. Compl. ¶¶ 35–36.) Koukos has not plead facts sufficient to raise an inference that a municipal policymaker, such as McFadden or Phillips, was aware of or acquiesced in a practice of intentionally failing to submit medical requests from suspected opiate addicts, to the extent that one existed. For this reason, his allegations are insufficient to state a *Monell* claim. *See Bielevicz*, 915 F.2d at 850 (holding that "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." (citing *Andrews*, 895 F.2d at 1480)).

### iv.

Finally, Koukos alleges that either the County has a custom of "deliberately ignoring the orders of outside doctors regarding the need for medical treatment" or has "failed to have a policy or procedure in place to follow up on Doctors' orders and provide seriously injured inmates medical care and treatment." (Pls.' Am. Compl. ¶¶ 51–53.) He alleges that the policymaking agents of CCP (and PrimeCare), McFadden and Phillips included, maintained "an

20

informal custom of limiting inmate hospitalizations and follow up care" and acquiesced in this custom despite "severe problems with denial or delay of medical care for inmates in the past." (*Id.* ¶¶ 54–55.)  Koukos contends that pursuant to this custom (or lack thereof), Defendants ignored the orders of Chester County Hospital, failed to provide him with prescribed antibiotics, pain medication and ice, failed to comply with the doctor's instructions of obtaining care from the ENTACC specialists within two to three days and, upon bringing him to the ENTACC appointment, failed to comply with their instructions regarding a follow-up visit.  (*Id.* ¶¶ 41–42, 47–48, 51–55.)  He claims that as a direct result of Defendants' practice of ignoring the instructions of outside doctors, the medical staff failed to ensure he obtained appropriate follow up treatment, denied and delayed prescribed treatment and caused him to endure needless pain and suffer permanent injuries.  (*Id.* ¶¶ 40, 49.)

Accepting Koukos's allegations as true, Defendants failed to follow medical directives from outside providers on several occasions and prevented Koukos from receiving "needed or recommended medical treatment."  *Rouse*, 182 F.3d at 197; *see also Estelle*, 429 U.S. at 104–105.  These allegations are sufficient to state a claim.  *See Green v. Wexford Health Sources, Inc.*, No. 16-3630, 2016 WL 7239891, at *6 (E.D. Pa. Dec. 14, 2016) (plaintiff's allegations that defendants ignored recommendations of outside medical providers and denied him adequate treatment were sufficient to state a *Monell* claim); *Stewart v. Wenerowicz*, No. 12-4046, 2015 WL 5092865 at *16 (E.D. Pa. Aug. 27, 2015) (holding that alleging customs of preventing inmates from receiving necessary and recommended medication and medical treatment and policies of denying medical treatment for non-medical reasons satisfies the policies or customs prong of *Monell*).

**v.**

Koukos has also asserted claims against the County under a failure to train theory, which are "analyzed as a species of 'custom or practice' liability." *Owens v. City of Philadelphia*, 6 F. Supp. 2d 373, 387 (E.D. Pa. 1998). Under this theory, "a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Natale*, 318 F.3d at 584 (quotations omitted). First, Koukos alleges generally that Defendants have maintained "either no system or an inadequate system of review of the medical care of inmates, which has failed to identify instances of deliberate indifference to serious medical needs or failed to discipline or closely supervise or train prison staff who are deliberately indifferent to inmates' serious medical needs." (Pls.' Am. Compl. ¶ 107.) Next, he contends that Defendants maintained "a system of grossly inadequate training pertaining to the treatment of inmates suffering with opiate withdrawal" with respect to the correctional officers. (*Id.* ¶ 108.) He claims that correctional officers should be properly trained in "identifying symptoms of opioid withdrawal" and "how to handle an inmate who is experiencing" such symptoms. (Pls.' Resp. in Opp'n, at 11.)

Koukos's allegations regarding a generally inadequate system of review and training to identify and prevent instances of deliberate indifference are too general to constitute a policy. *See, e.g.*, *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1028 (3d Cir. 1991) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. . . . Only where a failure to train reflects a

'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."); *see also id.* ("A § 1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury."). Moreover, "to sustain a claim based on a failure to train theory, 'the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)). Here, the alleged deficiency is too attenuated from Koukos's alleged injuries.

Koukos's allegations regarding inadequate training with respect to the care of inmates undergoing opiate detoxification and withdrawal are sufficiently specific and connected to his injuries to plausibly state a claim. However, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989). To plead the element of deliberate indifference for a failure to train claim, Plaintiff must ordinarily allege a "pattern of similar constitutional violations by untrained employees." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). A plaintiff may also assert a failure to train claim premised on a single incident. To do so, however, a plaintiff must show that the need to train officers was "so patently obvious" that the municipality's failure to train constituted deliberate indifference to the "highly predictable consequence" that failing to train would result in constitutional violations. *Connick*, 563 U.S. at 62 (citing *Canton*, 489 U.S. at 390; *Bd. of Cty. Comm'rs*, 520 U.S. at 398); *see also Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425, 440 (E.D. Pa. 2015) ("While it is possible to establish deliberate indifference based on a single incident[,] . . . this showing is available in a very narrow range of circumstances. To find deliberate

indifference from a single-incident violation, the risk of injury must be a highly predictable consequence of the municipality's failure to train and supervise its officers." (quotations and citations omitted)).

Koukos's amended complaint does not contain facts that could support a "pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. It does, however, contain enough facts to state a claim under the single incident method. He has identified a specific type of training that should have been provided to correctional officers—training to educate correctional officers on the symptoms of opiate withdrawal, the medical needs of individuals experiencing them and the appropriate course of action. He has alleged a causal nexus to his injury—had officers been trained accordingly, they would have recognized Koukos's symptoms, known that he needed immediate medical attention and permitted him to obtain it (by submitting his medical request slips or allowing him to go to the infirmary). *See* (Pls.' Am. Compl. ¶¶ 32–37, 74–76, 108–109). And he has pleaded facts suggesting that the need for this type of training was or should have been obvious. *See* (Pls.' Am. Compl. ¶¶ 56–67). Although this will ultimately be a difficult showing to make absent a pattern of violations, Koukos's allegations are sufficient, at this early stage, to state a claim for failure to train. *See Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) ("Although it is possible to maintain a claim of failure to train without demonstrating such a pattern, the *Bryan County* Court made clear that the burden on the plaintiff in such a case is high."); *see also Reynolds v. Municipality of Norristown*, No. 15-0016, 2015 WL 4450979, at *12 (E.D. Pa. July 17, 2015) (plaintiff's allegation that his injury resulted from failure to train officers in identifying individuals experiencing a medical emergency was sufficient to state a claim); *Hall v. Raech*, No. 08-5020, 2009 WL 811503, at *5 (E.D. Pa. Mar. 25, 2009) (plaintiff's allegation that his injury resulted

from failure to train officers in identifying symptoms of diabetic episode and taking appropriate action was sufficient to state a claim).

## IV.

For the reasons discussed above, Defendants' motion to dismiss is granted with respect to Koukos's claims against Correctional Doe 1, Correctional Doe 7, McFadden and Phillips.  Under Federal Rule of Civil Procedure 15(a), "courts may grant. . . amendments 'when justice so requires.'"  *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2004) (citing Fed. R. Civ. P. 15(a)).  While Rule 15 states that "leave to amend should be 'freely given,' a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  *Id.*; *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).  "Futility" means that the amended complaint would fail to state a claim upon which relief could be granted.  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).  The Third Circuit Court of Appeals has left the decision whether to grant or deny leave to amend within the sound discretion of the district court.  *Cureton v. Nat'l Coll. Athletic Ass'n*, 252 F.3d 267, 272 (3d Cir. 2001) (citations omitted).  Because amendment of Koukos's claims against Correctional Does 1 and 7, McFadden and Phillips would be futile, they are dismissed with prejudice.

An appropriate order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.